DUSSEAU v THE ROSCOMMON STATE BANK

1. EQUITY—DE NOVO REVIEW—APPEAL AND ERROR.

The Court of Appeals reviews chancery cases *de novo* on the record giving considerable weight to the findings of the trial court and the findings and decisions of the trial court are upheld unless the Court of Appeals would have reached a different result had it been in the trial court's position.

2. APPEAL AND ERROR—JUDGES—FINDINGS OF FACT—CREDIBILITY OF WITNESSES.

Findings of fact by the trial court will not be set aside unless they are clearly erroneous, whether the action is in law or equity, because the trial court has a special opportunity to judge the credibility of the witnesses.

3. EQUITY—APPEAL AND ERROR—FINDINGS OF FACT—MORTGAGES—FORECLOSURE—CLEARLY ERRONEOUS.

The Court of Appeals will set aside a finding of fact by a trial judge in an action in equity to foreclose a mortgage where the trial judge's finding as to the value of certain property released by the mortgagee was clearly erroneous and where the Court of Appeals would have reached a different result had it been occupying the position of the trial judge.

Appeal from Oscoda, Allan C. Miller, J. Submitted November 9, 1977, at Grand Rapids. (Docket No. 31561.) Decided January 5, 1978.

Complaint by Mary L. Dusseau against The Roscommon State Bank to restrain the defendant from foreclosing a mortgage until the value of a portion of the mortgaged property released by the mortgagee was duly ascertained and credited

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error §§ 704, 705, 882.
[2] 5 Am Jur 2d, Appeal and Error §§ 722, 822, 831.
[3] 5 Am Jur 2d, Appeal and Error §§ 882, 954.

against the mortgage. Defendant counterclaimed against the plaintiff and Lloyd A. Miller for foreclosure. Judgment of foreclosure granted with the value of the land released ascertained to be $2,500. Plaintiff appeals. Reversed and remanded.

*Larry C. Carl,* for plaintiff.

*Hugo L. Burzlaff,* for defendant Roscommon State Bank.

Before: R. B. BURNS, P. J., and D. E. HOLBROOK and R. B. MARTIN,* JJ.

D. E. HOLBROOK, J. This is an action in equity brought by plaintiff mortgagor, to restrain defendant bank from foreclosing a mortgage until the value of a portion of the mortgaged property released by the mortgagee was duly ascertained and credited against the mortgage. Defendant bank counterclaimed for foreclosure. Plaintiff appeals as of right from a judgment of foreclosure in favor of defendant, wherein the value of the land partially released was determined to be $2,500.

Plaintiff claims that the trial court erred in that the market value of the released portion of the mortgaged premises greatly exceeded the value placed on the land and credited against the mortgage.

On July 31, 1972, plaintiff and her former husband, Lloyd A. Miller, borrowed from defendant bank the sum of $11,000 and executed a mortgage on certain property described as follows: The West 1/2 of the Northeast 1/4 of the Northeast 1/4 of Section 36, Twp 27 North, Range 2E, Elmer Twp, Oscoda County, Michigan. Said mortgage was re-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

corded in liber 29 of mortgages, page 71 in the Register of Deeds Office for Oscoda County.

On July 15, 1973, plaintiff was divorced from Lloyd A. Miller by a judgment of divorce entered in the circuit court of Oscoda County, Michigan.

Under the terms of the judgment of divorce, a property settlement between the parties was ratified and made a part of the judgment. It provided that plaintiff was awarded the north 1/2 of subject mortgaged property, and plaintiff's former husband, Lloyd A. Miller, was awarded the south 1/2 of said subject mortgaged property and therein said Lloyd A. Miller agreed to assume the existing mortgage. The plaintiff's property awarded therein consisted of the homestead and other out buildings. The property awarded to Mr. Miller was vacant land. The mortgage provided that it was to be paid back at $1,100 per year on principal and interest was payable semi-annually at the rate of eight percent per annum. On July 31, 1973, Mr. Miller borrowed money from the bank on a personal note in order to pay the first $1,100 which was duly paid against the mortgage. He also paid interest amounting to $860, due up to July 31, 1973.

At the time of the mortgage Miller was in business at Mio and subsequently experienced financial difficulties in the fall of 1974. At that time, he made arrangements with a realtor, Mr. John Booth, to borrow $7,500 on the south 1/2 of the mortgaged property and another ten acres close by. Finally, it was decided that Miller would deed the property to Booth, the realtor, and $5,000 was paid to Miller. Miller and Booth then saw Mr. Jenner, president of the defendant bank, about obtaining a release of the south 1/2 of the mortgaged property. At this time, Mr. Jenner under-

stood that there had been a divorce, that the property had been divided by the divorce judgment and that Mr. Miller had agreed to pay the mortgage. Mr. Jenner agreed to release the property for $2,500, which was paid by check by Booth to Miller and defendant bank. Miller indorsed the check and the defendant bank applied the proceeds first to an unindorsed note of Miller's under his business name of Marsh Construction Company. Later the defendant bank, claiming error, applied said amount to the unindorsed personal note of Miller which was used to make the first payment on the mortgage. As a result, the defendant bank applied to the mortgage $792 interest to July 31, 1974, and $50.07 on the principal and interest of $393 paying interest to January 31, 1975. On November 20, 1974, date of the partial release, there was $9,900 due on the principal and interest of eight percent from July 31, 1973. There were other small amounts claimed for life insurance which are not material to a decision in this case.

The trial court disregarded the bank's entries and granted the entire $2,500 received against the mortgage. The issue before this Court is whether the trial court erred in determining the market value of the released property at $2,500.

It appears to this Court that when the parties were divorced and property settlement was approved and made a part of the divorce judgment, they voluntarily apportioned the mortgaged property between themselves, with a further provision that Mr. Miller was to assume the mortgage. This is immaterial to a decision in this case, because subsequently Miller went into bankruptcy. The defendant bank, knowing that the parties had been divorced and that the land had been divided

and apportioned between them and that the husband had agreed to assume the mortgage, was required to act in good faith in any partial release granted to the husband, Mr. Miller, of his portion of the mortgaged property. In 59 CJS, Mortgages, § 430, p 655, it is stated in part:

"Release or Purchase of Part by Mortgagee[1]
"A mortgagee who releases or purchases a part of the mortgaged premises must credit the value of that part in favor of the purchasers of other parts, so that they can be charged only with the remainder of the debt.
"If the mortgagee releases or purchases a part of the mortgaged premises, he is held to have consented to an apportionment of the mortgage and the value of that part is to be credited on the mortgage in favor of the purchasers of other parts, so that they can be charged only with the remainder of the debt. * * * It has been held that the amount to be credited is the market value at the date of the release or purchase, even though it exceeds the ratable contributory shares of the others toward the total indebtedness." (Footnotes omitted.)

We now review the testimony concerning market value of the released portions of the mortgaged premises. Five witnesses testified as to the value of the subject ten acres of land that was released from the mortgage by defendant bank and awarded to Mr. Miller under the divorce judgment.

Bobby E. Jenner, president of defendant bank, testified in part as follows:

"Q. [by Mr. Carl, plaintiff, counter-defendant's attorney] There wasn't any doubt in your mind, was there, Mr. Jenner, that the value of that south 10 acres, Parcel Number Two, was greater than the amount received by you, $2,500.00?

---

[1] Found in 41 CJ, Mortgages, § 842, p 762, fn 73: "Balen v Lewis, 130 Mich 567; 90 NW 416; 97 AmSR 499 [1902]." Also see, Hall v Edwards, 43 Mich 473; 5 NW 652 (1880).

"*A.* Yes, it could be some greater, I didn't think it was too far off.

"*Q.* Do you recall * * *

"*THE COURT:* (Interposing) Didn't you say it was sold for seventy-five hundred?

"*A.* That's 20 acres, sir, the one Number Four and Number Two sold for seventy-five hundred, I think, according to the deposition.

"*THE COURT:* The mortgage didn't cover them before?

"*A.* No, just Number One and Two.

"*Q. (Continued by Mr. Carl)* Do you recall testifying at the deposition in the following manner, and my question, Page 24, Question * * *

"*THE COURT:* (Interposing) What page?

"*Q. (Continued by Mr. Carl)* Page 24, Question, But the land, itself, was worth more than $2,500.00? Answer, Yes, the 10 acres. You recall having testified to that?

"*A.* Shaking head yes.

"*Q.* Look at it—Question, Looking at it now, what would you consider that 10 acres of land to be worth? Answer, $10,000.00. You recall having testified to that?

"*A.* Yes. Now, I considered 1975 and not 1973 *[sic* 1974] when the transfer was made.

"*Q.* So, what is your position what the value of the land was in 1973 *[sic* 1974]?

"*A.* Oh, probably three to four thousand dollars.

"*Q.* And you're telling us a 10-acre parcel increased in value in two years from three or four thousand dollars to $10,000.00?

"*A.* I question—I read the deposition, and I don't know whether I was confused or whether the writer is confused, because there's some other errors in there, but 10 acre parcels do sell for $10,000.00, and whether I was specifically referring to Parcel Number Two, or out on the market, you want to go out on the tree, you can find the right buyer that will pay ten, and I was a little confused about that statement, too, when I came across it.

"*Q.* But there isn't any doubt that this parcel that

was released was greater in value than the amount you received, the $2,500.00?

"*A.* Yes, I think I probably figured that I was getting two-thirds of the value, which would have been $2,500.00, and probably worth something like thirty-five or something like that.

"*Q.* Did you take into consideration comparable sales of property in the area in 1973 [*sic* 1974]?

"*A.* Yes, we finance quite a few parcels.

"*Q.* Not vacant parcels, have you, not vacant parcels, 10 acre parcels?

"*A.* No, but people build on them, and they buy them to build on.

"*Q.* Well, is it your testimony, then, from this deposition, that the property in 1975 when your deposition was taken was worth $10,000.00?

"*A.* No, I don't think that parcel would be worth—I wondered after reading it maybe if it wasn't both parcels worth $10,000.00. That figure confused me.

\* \* \*

"*Q.* (Continued by Mr. Carl) Okay, why don't you—okay, why don't you refresh your recollection from Page 25.

"*A.* Yes, I can see that's what I said, but I just feel that I must have been talking about the 20 acres.

"*Q.* Okay. What about the $6,500.00 figure that's mentioned on Page 25, is that what you would consider to be the value of the 10 acres together with an easement?

"*A.* Yah, then, 1975, that would be a value, yah, I think that would be pretty close.

"*Q.* Now, the easement that I referred to, you did become aware at some point that an easement will be given by Mrs. Dusseau to Lloyd Miller, and that easement was 66 foot in width and runs along the west boundary of this Parcel Number Two and Parcel Number One, is that correct?

"*A.* You made me aware of that. I've never seen it legally, but you said something about it.

"*Q.* Well, if that easement were granted, that would increase the value of the 10 acre parcel, would it not?

"*A.* Yes, I think so.

\* \* \*

"*Q.* And that is what you were referring to here on Page 25 of the deposition, $6,500.00, is that correct?
"*A.* Right.

\* \* \*

"*Q.* I think you've indicated you knew that Mrs. Dusseau was in possession of the house, did you not?
"*A.* Yes, I think she was in possession.
"*Q.* So, you knew that she had some equities of some kind, did you not?
"*A.* Right.
"*Q.* And she was a party to the mortgage?
"*A.* Yes, sir.
"*Q.* And this property, Parcel Number Two, was included within that mortgage?
"*A.* Yes, sir.
"*Q.* You took it upon yourself to release this without even so much as a telephone call to her, is that correct?
"*A.* Yes, sir.
"*Q.* And yet when it came in default afterwards, after this transaction was over with, you looked to her for payment of it, is that correct?
"*A.* Yes, sir.

\* \* \*

"*Q.* And when he [Mr. Miller] told you that, and when he took out this loan to make the mortgage payment, didn't he also tell you that I got to make the mortgage payments?
"*A.* I imagine he did, yes, sir."

Mr. Birdell T. Boyer, a licensed real estate broker since 1960 in the area of the subject land, testified in part as follows:

"*Q. [By Mr. Carl]* And you have sold property during this period of time?
"*A.* Yes, I have.
"*Q.* Now, did you at my request make an appraisal of

the—of Parcel Number Two, which is described on this diagram?

"*A.* Yes, I did.

"*Q.* And do you recall when that was performed?

"*A.* Not off the top of my head I don't. Excuse me a minute until I get my glasses on; around September the 15th, 1975.

"*Q.* I take it that that was the date that you went to the area and looked it over, is that correct?

"*A.* Yes, that's correct.

"*Q.* Have you had occasion in the past few years to appraise other parcels of property?

"*A.* Yes, I have.

"*Q.* And you've appraised them for Probate Court purposes I assume?

"*A.* Yes, I have.

"*Q.* And have you also appraised property for people independently?

"*A.* Yes.

"*Q.* People who wanted to get an appraisal on property?

"*A.* Yes, I have.

"*Q.* Have you sold parcels of property similar to the one which is * * *

"*A.* (Interposing) I have.

"*Q.* * * * described as Parcel Number Two?

"*A.* I have.

"*Q.* A 10 acre parcel, and I assume that there are quite a few factors that you take into consideration in making an aopraisal *[sic]* of property of this nature?

"*A.* Yes.

"*Q.* And having viewed this property, and based on your past experience as an appraiser, did you form any opinion as to the value—fair market value of this land in September of 1975?

"*A.* I did.

"*Q.* What was your opinion as to the value of Parcel Number Two?

"*A.* $8,000.00.

"*Q.* Did you also take into consideration the fact that there was an easement along the west boundary?

"*A.* Yes.

"*Q.* 66 foot in width?

"*A.* That I did.

"*Q.* And did you appraise that separately?

"*A.* Yes, I did.

"*Q.* And did that make it more valuable or less valuable?

"*A.* It made it more valuable.

"*Q.* And what did you appraise that at?

"*A.* $1,065.00.

"*Q.* Now, I realize that this was over a year ago, but I'm going to ask you to go—to attempt to give me your opinion as to the value of Parcel Number Two a year prior to the time that you actually made the appraisal inspection and appraisal.

"*A.* I think due to the recession real estate has been very stable in the last three, four years, hasn't been any big change in it from my experience and from what I read.

"*Q.* Do you have an opinion as to whether or not this land would be more or less valuable in November of 1974 as opposed to the time when you inspected it and submitted an appraisal in September of 1975?

"*A.* I would say it would be relatively no difference."

Mr. Ellsworth Handrich, a real estate broker with United Farm Agency, a national real estate brokerage, for about ten years, testified in part as follows:

"*Q.* *[By Mr. Carl]* You did, however, at my request perform an inspection and appraisal of the property which has been described as Parcel Number Two in this case, have you?

"*A.* Yes, sir.

"*Q.* And was that—do you know the date that you perform *[sic]* that appraisal?

"*A.* I really don't.

"*Q.* Would it have been in September of 1975?

"*A.* I would think it would be September or October, in that general time.

"*Q.* Have you had occasion in the course of your experience as a broker and/or salesman to sell 10 acre parcels of land?

"*A.* Yes.

"*Q.* Have you sold any within the past two or three years?

"*A.* Yes.

"*Q.* How many pieces of property, 10 acre parcels, have you sold in the past three or four years?

"*A.* I didn't check back, but I would presume half a dozen.

\*   \*   \*

"*Q.* What is your appraisal of the value of Parcel Number Two as of the time that you performed your inspection and appraisal in September of 1975?

"*A.* Eight thousand dollars.

"*Q.* And did you take into consideration an easement which runs along the west boundary of both Parcels One and Two, and is 66 foot in width?

"*A.* How do you mean did I take it into consideration?

"*Q.* Well, did you consider that this was landlocked property, or that it had access to it?

"*A.* No, I accepted the fact that there was an easement to the property.

"*Q.* And in your opinion, the value at the time you did this appraisal in September, 1975, was $8,000.00?

"*A.* Yes.

"*Q.* Now, you've been in the business for quite a few years. Would you say that that opinion of value in September of 1975 was significantly different, either more or less, than would have been the case in November of 1974?

"*A.* There could have been some. It could have been some less in value at that point, but how much \* \* \*

"*Q.* (Interposing) What specific factors would have occurred between November of '74 and September of '75 that would cause the price to fluctuate?

"*A.* The market for 10 acre parcels.

"*Q.* Has increased I take it?

"*A.* It continues to be one of the better items in real estate."

Mr. John Booth, the realtor who loaned Mr. Miller money on his 10 acres covered by the mortgage and another 10-acre parcel nearby and subsequently took a deed to the property for $7,-500 to $8,000, testified in part as follows:

"*Q. [By Mr. Burzlaff, defendant, counter-plaintiff's attorney.]* Would you indicate to us what you have this property listed for?

"*A.* I've asked $12,000.00 for the 20 acres. That's what I've advertised it for.

"*Q.* Twelve thousand for the entire 20?

"*A.* Yah, I don't think I've had an advertisement out for less than $12,000.00 for the 20 acres, but I offered last week the west 10 acres for $4,500.00, and that offer is good yet today.

"*Q.* Did anybody take you up on it yet?

"*A.* No. I was talking with a person who wanted to buy it, called me from Lansing to ask me about it.

"*Q.* Do you think this property is worth, in your opinion as a real estate broker, do you think it's worth $8,000.00?

"*A.* That 10 acres?

"*Q.* Yes, sir.

"*A.* With certain specific things, it might be.

"*Q.* How about in general? You're saying a specific buyer might come along and be attracted, is that what you're saying?

"*A.* It's got a few features about it. One is that with very little effort you could make a two or three acre pond in there, and all that country up there they have pressure veins, you have flowing wells, and it would be possible to make quite a valuable piece of property out of it.

"*Q.* Well, when I asked you the question, do you think it's worth $8,000.00, and I forget your exact reply,

but I believe your intent was somebody might come along and offer eight thousand for it?

"*A.* That's right.

"*Q.* But you've had it for sale, the entire 20, for $12,000.00, and you haven't sold it for that?

"*A.* No.

"*Q.* And you've advertised it at that?

"*A.* I've advertised it at that.

"*Q.* And you're willing to sell it for $4,500.00 now?

"*A.* That 10 acres.

"*Q.* That 10 acres.

"*A.* With the easement onto Kittle Road.

"*Q.* With the easement?

"*A.* Yah.

\* \* \*

"*A. [On cross-examination.]* We talked that I would have the listing, the selling of it indefinitely until it was sold.

"*Q. [Mr. Carl.]* Right, and didn't you attach to that listing agreement a breakdown of the Parcel Two into two lots, more or less, into two five acre parcels, you divided this?

"*A.* That breakdown, that's the way it was surveyed and given to me. I didn't make the breakdown, but the breakdown had been made, yes.

"*Q.* I see. All right. So that there was a parcel, that would be the south five acres, and a parcel, which would be the north five acres?

"*A.* That's right.

"*Q.* And then this north five acres here was also listed for sale, that would be three five acre parcels, isn't that correct?

"*A.* That's right, yes, he wanted to keep that one five acres; that's right.

"*Q.* And I assume he discussed with you the values that should be put on this for purposes of listing, did he not?

"*A.* He suggested, and I suggested, and we didn't—we did come to an agreement that we'd sell it somewhere in between the two, less than what he wanted, but more

than what I had suggested, in order to take care of the mortgage.

"*Q.* And isn't it true that the five acre parcel was listed for $4,000.00, and the other five acre parcel for four thousand and the five acre parcel on 72 listed for $7,000.00?

"*A.* Probably, but I don't have the figures * * *

"*Q.* (Interposing) You wouldn't disagree with that, though * * *

"*A.* (Interposing) * * * right at the present time.

"*Q.* * * * with the fact that they were listed that way?

"*A.* No, not unless I saw a listing that said different.

"*Q.* You don't have those documents with you I take it?

"*A.* No.

"*Q.* So, what you're saying, really, is that you don't have a willing buyer at the present time to purchase this property from you?

"*A.* No.

"*Q.* But at least when you took out the listing you felt that this was not too far out of line to ask $8,000.00 for Parcel Number Two if you were selling it in five acre parcels?

"*A.* When the listing was made, I'm in the position of a broker, not the owner, he was still the owner. That was his price that he was willing to offer it on the market for.

"*Q.* But as a broker, I assume that you advise your clients that—what the value of this land is, or what * * *

"*A.* (Interposing) I'm certain I did in that case, and his chances of getting that much money was quite slim, but with a—listing property, you can come down on price, but it's quite hard to go up.

* * *

"*Q.* (Interposing) And you knew, in fact, when you loaned him this money that he did it for the purpose of saving equipment, that it was about ready to be foreclosed on, isn't that true?

"*A.* His story was that he had just—since he had

obtained a divorce that he was going to take all of the equipment, and I had supposed, anyway, it belonged to his father-in-law, and he had to come up with quite a lot of money, and then he had property settlement involved with the divorce, and it left him in a situation that was kind of close, and he needed more time to work his way out.

"*Q.* But at any rate, you did know from discussions with him, and from general knowledge in the area, that he was having difficulty in his finances and in the operation of his business in November of 1974, did you not?

"*A.* Just what he told me that he had, yes.

"*Q.* And when this mortgage release was obtained you knew that he was in pretty tough financial condition at that time?

"*A.* You mean a year later?

"*Q.* A year later, yes.

"*A.* He was in tough condition. He told me he wasn't going to do anything about it. He said everybody was taking everything that he had, and I might as well get my share, and he said he'd give me a deed for it. That's about the language he used."

Mr. Clifford Schantz, equalization director of Oscoda County since March 1, 1975, and also township supervisor of Comins Township since 1967, testified in part as follows:

"*Q. [By Mr. Burzlaff.]* Now, I believe I made a request to you that you examine a parcel of property that's been the subject of this particular lawsuit here and make an appraisal of it, and that it's located out here in the vicinity of M-33 and M-72 and Kittle Road, and I believe it was—we've been referring to the subject parcel as Parcel Two here that's described as the South Half of the West Half of the Northeast, of the Northeast, or it may also be described as the Southwest Quarter of the Northeast Quarter of the Northeast Quarter of Section 36, Town 27 North, Range 2 East. Did you make that appraisal for us?

"*A.* Yes.

"*Q.* And when did you make that appraisal?

"*A.* I believe it was in the last of April or first of May of '76. It was last spring.

"*Q.* And did I advise you as to a particular date that I wanted as far as the value as of a particular date?

"*A.* You said that I should figure—derive at a value as of November of '74, I believe.

"*Q.* I see. Now, first, I assume that you did arrive at a value, is that true?

"*A.* Yes.

"*Q.* How did you arrive at a value, if you might indicate?

"*A.* Well, I went to the market and selected parcels of land that had sold over the last two or three years, and since each parcel of land is unique in itself, and you have—there are certain things that make it more valuable or less valuable, I took comparable parcels of 10 acre parcels and weighed—adjusted the comparable parcel to try and make it the same as the subject parcel.

"*Q.* In terms of what?

"*A.* Well, one thing that makes a smaller lot more attractive would be wooded, whether it's wooded or not, whether you have access to that, whether it's on a blacktop road, whether it's on a gravel road, whether they have an easement to it, or the time of sale would have an effect on it, if the market is shifting.

"*Q.* And how many comparable properties did you use in arriving at your appraisal?

"*A.* I believe I looked at seven that I used on the appraisal.

"*Q.* I see, and how many did you feel, after you had examined them all, were comparable to the 10 acres that you were asked to appraise?

"*A.* Real exactly like it, none.

"*Q.* I see, but then all property is unique you said?

"*A.* Yes, but I don't know of another parcel that sold in the last five years, three years, that would be exactly like that parcel.

"*Q.* Okay. Did you arrive at an opinion as to the value of this 10 acres in 1974, in November?

"*A.* Yes.

"*Q.* And what value did you determine?

"*A.* In my estimation, it's worth $3,250.00.

"*Q.* $3,250.00?

"*A.* Right.

\* \* \*

"*THE COURT:* What is the range of parcels for 10 acres in this county no, sales?

"*A.* Probably nine thousand would be top, and four thousand low. You would occasionally find one maybe lower, but it would be something definite wrong with it that it would lower its value.

"*THE COURT:* And what about in '73?

"*A.* '73, we've gone through a period when '73, '74 I think was fairly level in the values. Then, we went into a period in the fall of '75, and there's two—two or three parcels that I used were sold late in '75, but we hit a low in the market from say September of '75 until about April of this year."

This being an equity action, on review this Court is governed by the rule set forth in the case of *Ford v Howard,* 59 Mich App 548, 552; 229 NW2d 841 (1975), which states in part as follows:

"It is well-settled in Michigan that although chancery cases are reviewed *de novo,* this Court does not reverse or modify unless convinced that it would reach a different result had it occupied the position of the trial court. *Meyering v Russell,* 53 Mich App 695, 701; 220 NW2d 121 (1974); *Stribley v Michigan Marine Inc,* 42 Mich App 218, 221; 201 NW2d 702 (1972), *lv den,* 388 Mich 786 (1972).

"It is also true that, whether the action is in law or equity, principal regard must be given to the special opportunity of the trial court to judge the credibility of witnesses, and findings of fact will not be set aside unless they are clearly erroneous. GCR [1963], 517.1;

*Meyering, supra; Rencsok v Rencsok,* 46 Mich App 250, 253; 207 NW2d 910 (1973)."

The testimony of the five witnesses concerning value of the released portion of the mortgaged premises has been set forth herein from the record. The president of defendant bank testified and placed the value on the subject land at $3,500 to $3,750, stating that he figured the $2,500 amount was about two-thirds of the value; on another occasion he said the value was between $3,000 and $4,000; and on still another occasion he said the value of the property a year later (fall of 1975) was $6,500, but that the value had increased considerably in that one-year period.

Mr. Birdell T. Boyer, real estate broker, testified that in ·September 1975, he valued the subject property at $9,065 and that value would have been the same in the fall of 1974.

Mr. Ellsworth Handrich, real estate broker, testified that the value of the subject property in September 1975 was $8,000. Further, he said that the property could have been somewhat less in value in 1974.

Mr. John Booth, the realtor who purchased the property from Mr. Miller, stated he had it for sale at the time of trial for $4,500 and had not sold it as yet.

Mr. Clifford Schantz, equalization director of Oscoda County, testified that the value was $3,250 in November of 1974. He further testified that the range of value for 10-acre parcels sold in Oscoda County was between $4,000 and $9,000 and that values in 1973 and 1974 were constant and hit a low in the market from September 1975 until April 1976.

It is evident from the foregoing summaries of

testimony that the $2,500 value placed on the property was clearly erroneous. We further determine that had we been occupying the position of the trial chancellor, we would have reached a different result.

After careful review of the record, we believe the value of the released portion of the mortgaged premises should have been set at $4,500.

On July 31, 1973, the balance due on the mortgage was $9,900. The $4,500 should be credited against the interest and principal of the mortgage —interest of $792 to July 31, 1974, plus $264 interest to November 30, 1974, or $1,056 on interest and $3,444 on principal for a balance of $6,456. The interest due to November 30, 1976, would be $516.48 for a total of $6,972.48 due November 30, 1976.

Foreclosure may be ordered for said amount as of November 30, 1976, plus interest of eight percent on $6,456 until paid.

Reversed and remanded for entry of judgment of foreclosure in accord with this opinion. Costs to plaintiffs.