Kenneth L. Sanders appeals from a judgment for the defendant, Donald B. Flournoy, entered by the circuit court after a nonjury trial. Sanders sought a judgment declaring his rights and obligations under a vendor's lien held by Flournoy, which secured a promissory note that Sanders, along with Joe E. Raley and Joseph E. McCarron, Jr.,[1] had *Page 934 
executed, and Sanders's rights concerning improvements that Flournoy had constructed on Sanders's real property. Sanders requested that the circuit court declare that the consideration for a partial release of certain property from the vendor's lien had worked a full and complete satisfaction of the promissory note; or, in the alternative, that, in equity, the release from the vendor's lien of part of the property had worked a proportionate reduction of the indebtedness due under the promissory note.[2] Sanders also requested that the circuit court declare that Flournoy had no right, title, or interest in, or lien on, and was not entitled to the use and enjoyment of, certain improvements placed by Flournoy on Sanders's property. Flournoy counterclaimed, asking for a reformation of a deed issuing from Sanders. The circuit court, in its final judgment, held against Flournoy on this counterclaim, stating that "Flournoy failed to present sufficient evidence in support of his counterclaim." Flournoy does not appeal from the ruling on his counterclaim for reformation. The issues are whether Sanders is entitled to an abatement of the vendor's lien, either in full or by a proportionate amount, because of a partial release, executed by a former holder of the lien, of certain property that was secured by the lien; and whether Flournoy is entitled to a lien on improvements that he placed on Sanders's property.[3]
By a warranty deed dated June 11, 1984, Sallie Hudson, Helen H. Nespor, and Marvin V. Hudson ("Hudson and Nespor") conveyed to Sanders, Raley, and McCarron certain real property described in the deed as follows:
 "Lots 3, 4, and 5, Block 26, Bear Point Heights . . . [and] [t]he right, title and interest . . . in all that part of Gulf Drive lying West of Avenue E and lying South of Lots 4 and 5, Block 26, in Bear Point Heights. . . ."
"[A]ll that part of Gulf Drive lying West of Avenue E and lying South of Lots 4 and 5, Block 26"[4] has been referred to by the parties as either "lot 6," "parcel 6" or "Parcel 2." For purposes of this appeal, we will refer to it as "lot 6." Lots 3, 4, 5, and 6, as well as lots 1 and 2, were collectively known as "Hudson's Marina." Lot 6 was a waterfront lot adjoining lots 4 and 5. From the exhibits, we discern that much of lot 6, as well as much of lots 4 and 5, is subsumed by an inlet, which is where boats using the marina could dock.
The deed conveying the marina to Sanders, Raley, and McCarron stated that the transfer was supported by the consideration of $50,500, "cash in hand" and by the further receipt of $217,500, to be paid as evidenced by a promissory note executed by Raley, Sanders, and McCarron, that note to be secured by a vendor's lien in favor of Hudson and Nespor and reserved in the deed.
McCarron and Raley, in partial satisfaction of the note, transferred Units 404 and 405 of Back Bay Condominiums to Hudson and Nespor. The value of these condominium units was estimated to be $92,500 each. These transfers reduced the amount owing under the promissory note by $185,000, leaving an unpaid balance acknowledged by the parties as $33,000.
By a warranty deed dated August 31, 1984, Raley, Sanders, and McCarron conveyed the *Page 935 
following property as described in the deed to Frank J. Caron:
"PARCEL A
 "Lots 1 through 5, inclusive[,] of Block 26, Bear Point Heights . . . [and]
"PARCEL B
 "Lots 1 through 6, inclusive[,] of Block 27, Bear Point Heights. . . ."
Lot 6 of block 26 was not included in this conveyance. The terms of the deed indicated that the conveyance was subject to the Hudson and Nespor vendor's lien and that Caron was to assume the balance of the promissory note executed by Sanders, Raley, and McCarron to Hudson and Nespor, which balance the deed indicated was $33,000. Sanders testified that the total purchase price for the lots in blocks 26 and 27 was to be $1,200,000.
On April 26, 1985, Caron executed to the Baldwin County Savings and Loan Association a mortgage of property that included lots 1 through 5 of block 26. This mortgage did not include lot 6. Hudson and Nespor then assigned the 1984 note and vendor's lien to Baldwin County Savings and Loan Association. Baldwin County Savings and Loan Association, as consideration for this assignment, agreed to pay to Hudson and Nespor $31,095.41, which was the sum that Hudson and Nespor represented to be the total outstanding balance of the note, and to pay an additional $3,599.51. The apparent purpose for assigning the note and vendor's lien from Hudson and Nespor was for Baldwin County Savings and Loan Association to have first priority on lots 3, 4, and 5.
Baldwin County Savings and Loan Association later foreclosed Caron's mortgage and obtained title to lots 1 through 5 of block 26. The foreclosure deed does not evidence that it extinguished the note and vendor's lien that Baldwin County Savings and Loan Association also held by assignment.
Resolution Trust Corporation ("RTC") then acquired the assets of Baldwin County Savings and Loan Association.
In the spring of 1991, Flournoy offered to RTC to buy lots 1 through 5 and lot 6 of block 26.[5] After some negotiations, RTC executed on September 18, 1991, a partial release from the vendor's lien. This partial release stated that it released lots 3, 4, and 5 from the lien for the sum of $10. RTC sold lots 1 through 5 of block 26 to Flournoy for $103,500 on September 25, 1991. On September 25, 1991, RTC also assigned the vendor's lien to Flournoy for $33,500.
The circuit court refused to reduce the amount Sanders owed under the promissory note secured by the vendor's lien. The parties dispute whether the ore tenus rule and its presumption of correctness applies to the circuit court's ruling. "Under the ore tenus rule, the trial court's decision, 'where supported by the evidence, is presumed correct and should be reversed only if the judgment is found to be plainly and palpably wrong, after a consideration of all of the evidence and after making all inferences that can logically be drawn from the evidence.' " DeWitt v. Stevens, 598 So.2d 849, 850
(Ala. 1992) (quoting Martin v. First Federal Savings LoanAss'n of Andalusia, 559 So.2d 1075, 1078 (Ala. 1990)). Sanders argues that the facts are undisputed and that therefore the circuit court's holding is not entitled to any presumption of correctness. He cites the rule that "where the trial court's ruling rests upon a construction of facts indisputably established, this Court indulges no presumption of correctness in favor of the lower court's ruling." Alabama Farm BureauMutual Casualty Insurance Co. v. Dyer, 454 So.2d 921, 923-24
(Ala. 1984). However, in this case, there were disputed facts. The parties disputed whether Sanders, Raley, and McCarron intended to convey lot 6 to Caron in 1984. The specifics of the agreement Raley, Sanders, and McCarron had with Caron are not clear, e.g., whether Sanders and his partners intended to convey lot 6 to Caron, but omitted it from the deed by a mutual mistake of the parties. Thus, the ore tenus rule applies. *Page 936 
The first issue is whether Sanders was entitled to a reduction of the amount owed on the vendor's lien, because of the release of part of the security for the note: lots 3, 4, and 5.
Sanders argues that Alabama should adopt, and that we should apply in this case, a doctrine he terms "abatement" and under that doctrine reduce or extinguish the amount owed under the note and lien because of the partial release. The following paragraph is a summation of the doctrine:
 "If the mortgagee releases or purchases a part of the mortgaged premises, he is held to have consented to an apportionment of the mortgage and the value of that part is to be credited on the mortgage in favor of the purchasers of other parts, so that they can be charged only with the remainder of the debt. Accordingly, a purchaser of a part who pays the whole debt and takes an assignment of the mortgage is entitled to only a ratable contribution from the owners of the other parcels."
59 C.J.S. Mortgages § 430 (1949); see also 55 Am.Jur.2dMortgages § 473 (1971); Dusseau v. Roscommon State Bank,80 Mich. App. 531, 264 N.W.2d 350 (1978); Webb v. Harrington,504 S.W.2d 252 (Mo.App. 1973). Sanders argues that RTC's sale of lots 3, 4, and 5 and its release of those lots from the vendor's lien were inequitable, unless Sanders is allowed a reduction in the amount owing under the lien.
No Alabama case is cited, nor has our research revealed a case in which this Court recognized this doctrine of apportionment.[6] Even assuming it to be a principle that might apply in the proper case, this would not be the proper case in which to recognize such a doctrine. The circuit court "specifically [found] from the evidence that the partial release of adjoining lands does not cause or entitle Plaintiff Sanders to a proportionate reduction or apportionment of the indebtedness due under the terms of the subject Promissory Note and Vendor's Lien," and denied Sanders's claim for relief. Under the facts and circumstances of this case, we find no error in the circuit court's denial of relief.
The second issue is whether Flournoy was entitled to a lien on lot 6 in the amount of the value of the improvements he made on the lot. Flournoy erected a seawall, mooring pilings, catwalks, and a pier on lot 6. He also dredged the water basin, cleared off a good deal of debris, and made various other improvements to lot 6. Sanders testified that at some point he became aware that the Town of Orange Beach was trying to acquire lots 1 through 6 of block 26 from RTC. Sanders stated that Noma Mims, an employee of RTC, contacted him and asked that he execute a quitclaim deed for lot 6 to the RTC. He stated that he refused.
He then stated that after the "deal fell through with Orange Beach" he started hearing rumors that RTC was about to sell the lots again. Sanders stated that he heard a rumor that an attorney he knew was representing the person who was trying to buy the lots. This person was Flournoy. Sanders stated that he went to the attorney and told him, "I don't know what my rights are in this situation. But it's my intention to exercise all of my rights." The attorney at that time apparently told Sanders, "Well, George, you ain't got any." Sanders stated that he had this conversation with Flournoy's attorney before any improvements were made on lot 6. He then stated that he later passed by his property and noticed "big mounds of sand" piled on lot 6 and noticed also a new seawall and a bulkhead, and new piers. Sanders again went to Flournoy's attorney and told him, "Would you please have your client to quit building on my property." *Page 937 
Noma Mims testified that she had formerly been employed by the Baldwin County Savings and Loan Association and was assigned to RTC to help liquidate the savings and loan association's assets. Mims stated that RTC first tried to sell the property to the Town of Orange Beach in August 1990. Then, in the spring of 1991, she said, Flournoy approached her about buying the Hudson's Marina property. She stated:
 "I remember discussing with him the [lay] of the land and telling him that we had a problem with having not foreclosed the vendor's lien deed, and that there were questions about street vacations."
She also testified:
 "I remember talking with him about going to an attorney that he had confidence in and perhaps a title insurance company to discuss the effect of the vendor's lien deed and the foreclosure and the street vacations. We discussed the price and I probably called the RTC."
She stated that she set up an appointment for him with the attorney who later represented Flournoy in the closing and with whom Sanders had spoken. Mims stated that Flournoy submitted to the RTC a written offer to purchase the property. RTC accepted his offer to purchase the property for $137,000. Flournoy testified that three or four days after he retained the attorney to whom Mims referred him he made his offer to buy the property.
Flournoy also testified. He stated that he had lived in Prattville, Alabama, for approximately 30 years and had moved to Orange Beach in February 1992. He had bought one other piece of property in Prattville in the late 1980's before he acquired lots 1 through 5 of the Hudson's Marina property. Flournoy stated that the Hudson's Marina property was the first property he had bought for a commercial use. He stated that he first spoke with Mims in April 1991. He stated that he telephoned her one morning and then went to meet with her. He said that the following occurred at the meeting:
 "We discussed a selling price based on a selling price that was established earlier. Something about Orange Beach Marina, I mean, Orange Beach city was going to buy it. And I knew about how much money I had and how much I could get together and I put it together and I offered her that price."
He testified he offered $137,000 for what he called "Hudson's Marina." He stated that "Hudson's Marina" he thought was "[e]verything from the pink houses down to the water." He testified that his offer was to include lots 1 through 6.
The following is from the transcript of his testimony:
 "Q. At some point in the process, did any discussions come up about whether or not the RTC could convey good title to you on all of the property?
 "A. Yes and no. Yes, in that initially she said there was a problem with the vacated Gulf Drive part but it was an error of omission and could be walked through the system and gotten straightened out with minor problems."
He stated that he later spoke with someone in RTC's Atlanta office who told him that they could give him complete documentation regarding the property. Flournoy stated that he waited from April to August 1991 "for RTC to provide documentation and they said they would in order to complete the sale." He stated:
 "Then sometime in August, mid-August, I believe, they said they could not provide the original agreement documentation and the best thing they could do was give me clear title to lots one through five and a vendor's lien on the Gulf Drive property, which I would have to foreclose on at some future date."
Flournoy then was asked, "Was that acceptable to you at that time?" He answered, "Considering I had already accepted their word it was mine totally and I had already gone forth with some construction, I didn't have a choice."
Flournoy also testified that he had expended over $100,000 for improvements to all of the lots.
On cross-examination, Flournoy testified to the following: *Page 938 
 "Q. Mr. Flournoy, when you first came down and identified this property as something that you might be interested in, you didn't know anything about it, is that right?
"A. That's true.
 "Q. And you understand that before you go out and buy a piece of property, particularly somebody that's had as little experience in buying and selling property as you have, you understand the importance of getting professional advice to assist you; do you not?
"A. I do now.
"Q. You did not then?
 "A. I was a novice at what I was doing, that's correct."
Flournoy also testified:
 "Q. And your testimony is that when you launched out on the venture to invest a part of your retirement, you did not understand the need to get professional advice before you spent that money?
 "A. I knew I needed to get somebody to close, help close the thing. I didn't figure I needed somebody to help me make an offer on it."
He stated, regarding the point when he made his offer, "RTC told me that I bought Hudson's Marina. And [an employee] provided me a survey of Hudson's Marina and that's what I bought." This survey, Flournoy testified, went "all the way down to the water's edge."
The following also occurred during cross-examination:
 "Q. So, you didn't know at the time you made your offer that you might not be buying all the way down to the water's edge?
". . . .
 "A. Well, no. When I made my offer, Mrs. Mims said there was a problem — I think she called it a problem of omission. And that the Gulf Drive property had not been foreclosed on but it would be straightened out."
Flournoy also stated that several weeks after he made his offer, "RTC told [him it] would provide clear title to the property, all of it."
Flournoy stated that his attorney told him that the problem with lot six "looked like it could be handled but he wanted to handle it after closing."
He also stated that "Up until mid-August, I thought I was going to get parcel six." He stated that he made the improvements on the property before the closing, because RTC told him, "[I]t's yours, take possession of it. Clean it up and do what you want with it."
Flournoy stated that he was a former United States Government employee, and "when the Government tells me something, I believed [sic] it." Flournoy testified that by mid-August he had already constructed most of the improvements. RTC conveyed lots 1 through 5 and assigned the vendor's lien to Flournoy on September 25.
The circuit court wrote in its final judgment:
 "The Court . . . finds from the evidence that following his purchase of the adjoining property and his acquisition of the subject vendor's lien on September 29 [sic], 1991, Defendant Flournoy constructed improvements both on his land and on the vacated portion of Gulf Drive subject to the outstanding vendor's lien. These improvements consisted of piers, wharves and associated structures used in the operation of Flournoy's marina facility, all of which are interrelated in design, function and utility. The Court specifically finds that Flournoy, who is not a sophisticated purchaser or developer of real estate, constructed these improvements in good faith, through a reasonable mistake of fact and in reasonable reliance on representations made to him by others. Under these circumstances, it would be unjust and inequitable to allow Plaintiff Sanders the use and occupancy of the improvements without awarding to Flournoy the reasonable value thereof. Therefore, the Court hereby awards to Defendant Flournoy an equitable lien on that portion of the improvements which are constructed adjacent to the vacated portion of Gulf Drive."
The court later held a hearing, after which it awarded Flournoy a lien on lot 6 for the *Page 939 
value of improvements and expenses allocable to lot 6 in the amount of $31,290.
 "The imposition of an equitable lien has been limited to three situations in Alabama:
 " '(1) [It may be had] where an improver, acting in good faith and under the mistaken belief that he owns the land, makes improvements on the land of another, being induced to do so by 'fraud, duress, undue influence, or mistake of such character that he is entitled to restitution,' [citation omitted]; (2) where the true owner of land makes a demand for the rents and profits, a bona fide occupant under a claim of title who has made valuable improvements on the land is entitled to compensation by way of set-off against the rents or profits accruing during his occupancy, [citation omitted]; and (3) where a true owner brings an action to recover possession of land, the defendant may recover for permanent improvements by way of set-off against the value of the use and occupation of the land, upon the defendant's suggestion and proof of adverse possession for three years preceding the complaint, Ala. Code 1975, § 5-5-286.' "
Prince v. Crow, 589 So.2d 161, 163 (Ala. 1991) (quoting Manningv. Wingo, 577 So.2d 865 (Ala. 1991)).
This Court has held:
 "A bona fide occupant under claim of title, who makes valuable and permanent improvements, is entitled to compensation, certainly by way of set-off against the mesne profits. A bona fide occupant has been defined to be 'one who not only honestly supposes himself to be vested with the true title, but is ignorant that the title is contested by any other person claiming a superior right to it.' If a mortgagee after foreclosure, or a purchaser at or after the foreclosure sale, makes permanent improvements, in the honest belief that he has acquired the absolute title, compensation should be allowed on a bill for redemption. Knowledge, or actual notice of the adversary right, is fatal to the claim for compensation. The allowance is made on equitable grounds, and it is not equity to allow it to one who has not acted in good faith; otherwise, a mortgagor might be improved out of his property, by increasing the burden of redemption."
Gresham v. Ware, 79 Ala. 192, 199 (1885) (citation omitted).See also Manning v. Wingo, 577 So.2d at 869, stating that, "InGresham v. Ware, supra, this Court held that knowledge of an adverse claim to the title is fatal to the improver's claim for compensation."
The evidence shows that Flournoy did have knowledge "of the adversary right." Sanders told Flournoy's attorney before any improvements were made that he intended to exercise all his rights in the property. Such notice constituted notice to Flournoy. Knowledge of the attorney will be imputed to the client if the knowledge comes to the attorney while engaged in a service for the client after the attorney-client relationship has commenced. See Ball v. Vogtner, 362 So.2d 894,898 (Ala. 1978). Also, RTC, through Mims, told Flournoy from the beginning that there was a problem with conveying part of the property. Flournoy admitted that Mims had told him there was a problem with the conveyance, but argued that she had described it only as a "minor problem."
Flournoy also admitted that he began construction of improvements before the sale was closed. The circuit court stated in its judgment that "following his purchase of the adjoining property and his acquisition of the subject vendor's lien on September 29 [sic], 1991, Defendant Flournoy constructed improvements both on his land and on the vacated portion of Gulf Drive subject to the outstanding vendor's lien." However, it was undisputed that Flournoy began construction no later than August, before he had any claim of title to any of the property in question. Thus, Flournoy did not have even a "mistaken belief that he own[ed] the land,"Prince v. Crow, supra, nor was he a "bona fide occupant under claim of title," Gresham v. Ware, supra, when he began his improvements and when he completed a substantial portion of them.
The evidence shows, without substantial dispute, that Flournoy had notice of Sanders's adverse claim to lot 6. Moreover, he *Page 940 
had no claim of title at all when he began his improvements. For these reasons, that portion of the judgment awarding him the value of the improvements is contrary to the principles established in the cases cited above.
That portion of the judgment refusing to allow an abatement or apportionment of the amount of the note secured by the vendor's lien is affirmed. That portion of the judgment imposing an equitable lien on lot 6 for the value of improvements made by Flournoy is reversed. The cause is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
HORNSBY, C.J., and ALMON, HOUSTON, KENNEDY and COOK, JJ., concur.
[1] Raley and McCarron were involved in bankruptcy proceedings during the trial of this matter. The circuit court, upon Flournoy's motion, originally joined them as parties under Rule 19(a), A.R.Civ.P. The circuit court later dismissed Raley and McCarron, and joined Lonnie Mixon, as bankruptcy trustee for McCarron, and C. Michael Smith, as bankruptcy trustee for Raley.
[2] The vendor's lien originally covered lots 3 through 6; after the release, the note was secured only by lot 6. Sanders owns lot 6, and Flournoy owns lots 3 through 5.
[3] In its original judgment, the circuit court reserved for later hearing the ascertainment of the value of Flournoy's improvements, but directed the entry of a final judgment on the merits. See Rule 54(b), Ala.R.Civ.P. Appeal No. 1921127 comes from that judgment. Appeal No. 1921310 comes from the judgment ascertaining the value of the improvements. We will treat them as a single appeal.
[4] Hudson and Nespor had this part of Gulf Drive vacated "so as to destroy the . . . original dedication of said part of said drive and to divest all public rights," before it was transferred to Sanders, Raley, and McCarron.
[5] There was a dispute over whether RTC made Flournoy aware that it did not have clear title to lot 6. However, this is relevant only to a discussion of the second issue, whether Flournoy was entitled to a lien on the improvements he made on Sanders's property.
[6] Several cases discuss the right of a purchaser of a portion of a parcel of mortgaged land to have a release from the mortgage upon payment to the mortgagee, pursuant to written agreements between the mortgagor and the mortgagee. See Massingale v.Little, 235 Ala. 292, 178 So. 539 (1938); Michie v. Bradshaw,227 Ala. 302, 149 So. 809 (1933); Title Ins. Co. v. CowanLumber Co., 226 Ala. 485, 147 So. 665 (1933); McCoy v. Wynn,215 Ala. 172, 110 So. 129 (1926). None of these cases concerns the extent of the mortgage lien on the mortgagor's remaining property, however. In Moyer v. Ridley, 234 Ala. 546,176 So. 299 (1937), the Court held that the mortgagor was not entitled to have subdivided lots removed from the mortgage, holding that the release agreement applied only when lots were sold.